**Gary HALL, Block Island Lobster Co. Inc. and Canyon Industries, Inc.,**

**v.**

**The Honorable Donald EVANS, as**

he is Secretary of Commerce.[1]

F/V Reaper, Inc. and Gregory
N. Duckworth,

v.

Donald Evans, in his official capacity as
Secretary of Commerce; and Penny
Dalton, in her official capacity as Di-
rector of the National Marine Fisher-
ies Service.

Lund's Fisheries, Inc., Export, Inc.,
Frances Ann, Inc. and F/V
Monica, Inc.,

v.

The Honorable Donald Evans, as he
is the Secretary of Commerce.

William P. McCann and Captain
W.P. McCann, Inc.,

v.

The Honorable Donald Evans, as he
is the Secretary of Commerce.

Nos. CIV. A. 99–549L, CIV. A. 99–550L,
CIV. A. 00–338L, CIV. A. 00–436L.

United States District Court,
D. Rhode Island.

Aug. 14, 2001.

1. At oral argument on February 21, 2001, the parties agreed to substitute the current Secretary of Commerce, Donald Evans, as a defendant in all four cases in place of William M. Daley.

Timothy J. Dodd, Providence, RI, Stephen M. Ouellette, Cianciulli & Ouellette, Beverly, MA, Mark A. McSally, Kelly, Kelleher, Reilly & Simpson, Providence, RI, for plaintiffs.

Brian Clifford Newberry, Hinckley, Allen & Snyder, Providence, RI, Steven E. Snow, Partridge, Snow & Hahn, Providence, RI, for defendants.

### MEMORANDUM AND ORDER

LAGUEUX, District Judge.

This Court agrees with most of the conclusions and opinions contained in Magistrate Judge Robert W. Lovegreen's Report and Recommendation dated April 13, 2001. The Court agrees with the Magistrate Judge's conclusion that the gear differential violates National Standards Two and Five. Under the regulations adopted, vessels that use trawl gear can land up to 1500 lbs. tail-weight per day at sea, while vessels that do not use trawl gear (including gillnetters) may only land and possess up to 300 lbs. tail-weight of monkfish per day at sea. The Court agrees with the Magistrate Judge that National Standard Two has been violated because the Secretary has not utilized the best scientific information available in establishing the 300 lb. limit for non-trawlers. The Court also agrees that National Standard Five has been violated because there is no documentation that the gear differential results in an equitable proportional reduction for each category.

In addition, this Court concludes (as opposed to the Magistrate Judge) that National Standard Four has also been violated because there is no evidence in this record that this allocation is fair and equitable as to all monk fishermen.

While some form of gear differential may be supportable, there is no scientific evidence in this record and, in fact, no evidence at all that supports this grossly disparate gear differential. Therefore, the

imposition of the 300 lb. limit on non-trawlers is arbitrary and capricious. It is hereby vacated and all monk fishermen will be governed by the 1500 lb. limit until such time as the Secretary establishes a fair and equitable gear differential or otherwise revises the catch limit for all monk fishermen.

Judgment shall be entered for all the plaintiffs in these four consolidated cases to that effect forthwith.

It is so ordered.

LOVEGREEN, United States Magistrate Judge.

### REPORT AND RECOMMENDATION

*Dim moon-eyed fishes near*
*Gaze at the gilded gear*
*And query: 'What does this vaingloriousness down*
*here?'*

Thomas Hardy, *The Convergence of the Twain*

On November 5, 1999, plaintiffs F/V Reaper, Inc. and Duckworth[2] ("Reaper plaintiffs") filed a three-count complaint and plaintiffs Hall, Block Island Lobster Company, Inc., and Canyon Industries, Inc.[3] ("Hall plaintiffs") filed a six-count complaint in this court seeking judicial review[4] of rules promulgated by defendants regarding the "Monkfish Fishery Management Plan" ("MFMP").[5] On November 8, plaintiffs Lund's Fisheries, Inc., Export, Inc., Frances Ann, Inc. and F/V Monica, Inc. ("Lund's Fisheries plaintiffs") filed a six-count action in the United States District Court for the District of New Jersey, which was subsequently transferred to this court on July 10, 2000. Plaintiffs McCann and Captain W.P. McCann, Inc. ("McCann plaintiffs") filed their original six-count complaint on November 5, 1999, and an amended six-count complaint on November 18, 1999, both in the United States District Court for the District of Massachusetts. Venue in that case was transferred to the District of Rhode Island on August 29, 2000, and on October 13, 2000, all four cases were consolidated by Consent Order. The consolidated plaintiffs moved for summary judgment on October 20, 2000 ("Plaintiffs' Motion") (the Reaper plaintiffs joined in the Memorandum submitted by the other plaintiffs on November 9, 2000), and filed a motion to further supplement (sic) the record contemporaneously. Defendants cross-moved for summary judgment on December 1, 2000 ("Defendants' Motion"). Plaintiffs then filed a reply brief on December 21, 2000 ("Plaintiffs' Reply"), and at the request of the court, the parties filed a document entitled "Stipulated to Excerpts from Administrative Record" ("Record") on January 3, 2000. After prompting by this court, defendants filed a summary judgment memorandum errata on February 7, 2000. In essence, plaintiffs in all four cases contend that

---

**2.** Plaintiff F/V Reaper, Inc. is a corporation organized and existing under the laws of the State of Rhode Island with its principal place of business in South Kingstown, Rhode Island. Plaintiff Gregory N. Duckworth is the owner of all of the shares of F/V Reaper, Inc.'s stock and captain of the F/V Reaper vessel.

**3.** Plaintiff Canyon Industries, Inc. joined this action on December 6, 1999 when the plaintiffs filed an amended complaint for injunctive and declaratory relief.

**4.** This Court has jurisdiction to review these rules pursuant to 16 U.S.C. § 1855(f), 5 U.S.C. § 701 *et seq.*, and 5 U.S.C. § 611.

**5.** The Fishery Management Plan established a system for the issuance of permits authorizing the fishing of monkfish to address market concerns regarding the over-fishing of monkfish. *See* 50 C.F.R. § 648.1 *et seq.* (1999).

certain MFMP regulations regarding landing limits violate various provisions of the United States Code.

This matter has been referred to me for preliminary review, findings, and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Local Rule of Court 32(c). A hearing was held on February 21, 2001. After examining the memoranda submitted, listening to the arguments of counsel and conducting my own independent research, I recommend that plaintiffs' motion for summary judgment be granted as to Counts One, Three and Four of the Hall Complaint; Counts One, Three and Four of the Lund's Fisheries Complaint; and Counts One, Three and Four of the McCann Complaint. I conversely recommend that the court deny plaintiffs' motion for summary judgment as to all other Counts in all four Complaints.[6] I also recommend that defendants' motion for summary judgment be granted as to all Counts of the Reaper complaint; Counts Two, Five and Six of the Hall Complaint; Counts Two, Five and Six of the Lund's Fisheries Complaint; and Counts Two, Five and Six of the McCann Complaint. Finally, I recommend that the regulations 50 C.F.R. § 648.94(b)(2)(iii) and 50 C.F.R. § 648.94(b)(2)(v) be set aside pending further proceedings based on the regulations' failure to comport with National Standard Two of the Magnuson Stevens Act. Alternatively, I recommend that the court remand the regulations to the Secretary of Commerce and require that the Secretary or his designees provide evidence that the regulations comport with National Standard Five of the Magnuson–Stevens Act.

*Factual Background*

The monkfish, or *Lophius americanus* (also called goosefish or anglerfish, and sometimes culinarily derided as "the poor man's lobster"), is the essential subject of this action. *See* Record, 2365. The monkfish is ubiquitous in the Northwest Atlantic Ocean and is also found from the Gulf of St. Lawrence south to Cape Hatteras, North Carolina. It is known to inhabit waters ranging from the tide-line to depths of 840 meters and is comfortable in a wide range of water temperatures. The adult animal tends to reside on the ocean floor, hovering over a range of substrate types including hard sand, gravel, broken shell and soft mud. *See* Record, 7316. In years past, monkfish were landed as incidental "bycatch by trawlers in the groundfish and scallop industry." Defendants' Motion, P. 3. More recently, however, as the market for monkfish has increased, monkfish have been targeted directly by fishing vessels, and the stocks as well as the average size and weight of the monkfish have diminished substantially. Record, 7318. On September 30, 1997, the monkfish fishery was determined to be overfished[7] on the basis

---

**6.** Several Counts in the various Complaints have not been briefed at all in the plaintiffs' consolidated memorandum of law. For all of these, I recommend that the court grant summary judgment to the defendants. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. As we recently said in a closely analogous context: 'Judges are not expected to be mindreaders. Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly' or forever hold its peace.' ") (citing *Rivera–Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir.1988) (citing *Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co.*, 840 F.2d 985, 990 (1st Cir.1988))).

**7.** "The terms 'overfishing' and 'overfished' mean a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(29). Maximum Sustainable Yield is in turn defined as the "largest long term average catch or

of inadequate stock level, prompting a number of remedial measures, including the ones at issue in this case, undertaken pursuant to the Magnuson–Stevens Fishery Conservation and Management Act of 1976. Record, 7251; *see* 16 U.S.C. §§ 1801 et seq.

### a. *The Reaper Complaint*

The Reaper plaintiffs are fishers who use sink gillnets, fixed gear nets that lie on the ocean bottom for a time before they are hauled aboard a ship. They possess limited access permits to engage in multispecies and monkfish fishing in the Atlantic Ocean. The MFMP governs the distribution of these permits and any vessel applying to engage in monkfish fishing must meet the criteria set forth in the MFMP. Plaintiffs contend that they qualify for a Category A permit as defined by 50 C.F.R. § 648.4 (1999).[8]

The MFMP, as set forth in 50 C.F.R. § 648.94(b)(2)(iii) (1999), authorizes Category A vessels that use trawl gear to land up to 1,500 pounds tail weight per day at sea. Category A vessels that do not use trawl gear, however, may only land and possess up to 300 pounds of tail weight of monkfish per day at sea. *See* 50 C.F.R. § 648.94(b)(2)(v) (1999). Because plaintiffs do not use trawl gear, the MFMP restricts them from landing or possessing more than 300 pounds of tail weight of monkfish per day at sea.

In Count One of their complaint, the Reaper plaintiffs allege that 50 C.F.R. § 648.94 violates 16 U.S.C. § 1851(a)(4), which provides:

Conservation and management measures shall not discriminate between residents of different states. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fisherman; (B) reasonably calculated to promote conservation; and (C) carried out in such a manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

Plaintiffs assert that defendants have violated this section by distinguishing between Category A permit holders who employ trawling gear and those that use other types of gear. In addition, plaintiffs opine that 50 C.F.R. § 648.94 violates 5 U.S.C. § 706(2)(A) and (C).[9]

---

yield that can be taken from a stock under prevailing ecological and environmental conditions." 50 C.F.R. § 600.310(c)(1)(i).

**8.** The C.F.R. states the following regarding Category A permits:

(i) Limited access monkfish permits (effective November 8, 1999).
(A) Eligibility. A vessel may be issued a limited access monkfish permit if it meets any of the following limited access monkfish permits criteria:
(1) Category A permit (vessels without multispecies or scallop limited access permits). The vessel landed >= 50,000 lb (22,680 kg) tail-weight or 166,000 lb (75,297.6 kg) whole weight of monkfish between February 28, 1991, and February 27, 1995;....

**9.** 5 U.S.C. § 706(2) states in pertinent part:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—...
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;

In Count Two, plaintiffs state that 50 C.F.R. § 648.94 (1999) also violates 16 U.S.C. § 1851(a)(6), which provides: "Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources and catches." Again, plaintiffs maintain that defendants have violated this section by distinguishing between Category A permit holders who trawl fish and those that fish with gillnet gear.

In Count Three, plaintiffs allege that the defendants did not comply with 5 U.S.C. § 604(a)(5), which requires the following:

(a) When an agency promulgates a final rule under section 553 of this title, after being required by that section or any other law to publish a general notice of proposed rulemaking, or promulgates a final interpretative rule involving the internal revenue law of the United States as described in section 603(a), the agency shall prepare a final regulatory flexibility analysis. Each final regulatory flexibility analysis shall contain—

. . .

(5) a description of steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

Plaintiffs ask this court to declare 50 C.F.R. § 648.94 invalid and grant any additional relief that this court considers just and appropriate.

. . . .

b. *The Hall Complaint*

The Hall plaintiffs are owners of fishing vessels: plaintiff Hall, a Block Island, Rhode Island resident, owns and operates the F/V Nora's Haul; plaintiff Block Island Lobster Company, Inc., a Rhode Island corporation, is the owner and operator of the F/V Mad Monk; plaintiff Canyon Industries, Inc., a Massachusetts corporation, is the owner and operator of the F/V Canyon Explorer. All three plaintiffs fish for monkfish off the coast of New England and the Mid Atlantic States and hold limited access permits for their piscatory activities. Like the Reaper plaintiffs, the Hall plaintiffs use sink gillnets to fish for monkfish.

In Count One, the Hall plaintiffs allege that the MFMP regulations violate 16 U.S.C. § 1851(a)(2), which states: "Conservation and management measures shall be based upon the best scientific information available." According to plaintiffs, the defendants' "designees ignored their own conclusions and fishermen's logbook information that demonstrated that the challenged gillnet gear restrictions will not have the stated monkfish conservation effect." Amended Complaint, ¶ 51.

Count Two is precisely the same as the Reaper plaintiffs' Count One above.

In Count Three, the Hall plaintiffs claim that the regulations implementing the MFMP violate 16 U.S.C. § 1851(a)(5), which states: "Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose." According to plaintiffs, the regulations implementing the MFMP "operate solely to allocate the ability to fish for monkfish based on gear type, and the economic benefits to be accrued therefrom,

to fishermen not affected by the challenged gear restrictions." Amended Complaint, ¶ 57.

In Count Four, the Hall plaintiffs assert that the defendants abused their discretion and abdicated their statutory obligations under 5 U.S.C. § 706(2)(A) and (C).

In Count Five, the Hall plaintiffs maintain that the defendants, through their designees, deprived plaintiffs of property without due process of law by failing to review the gear restriction challenged in this lawsuit. According to the plaintiffs, this same omission violated the Administrative Procedures Act.

In Count Six, the Hall plaintiffs allege that the defendants violated 5 U.S.C. § 603(c), which requires the defendants and his designees to complete an initial regulatory flexibility analysis describing any significant alternatives to the proposed rule which "accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities." Plaintiffs contend that the defendants failed both to conduct the initial regulatory flexibility analysis and to solicit public comments regarding the challenged gear restriction.

The Hall plaintiffs ask this court to: (1) declare that the defendants acted arbitrarily and capriciously when they and their designees implemented regulations concerning the gillnet monkfish trip limit, days at sea limit, gear restriction, and trip limits; (2) set the gillnet monkfish trip limit aside and make the trip limit the same for all gear types; (3) declare the regulations implementing the MFMP in violation of the Regulatory Flexibility Act and suspend these restrictions as they relate to small entities; (4) order the defendants to conduct a full Regulatory Flexibility Analysis; (5) award plaintiffs their costs and attorneys' fees; (6) enter a pre-liminary injunction preventing the defendants from enforcing a separate gillnet trip limit pending hearing on the merits; (7) schedule a hearing on the merits; and (8) award such other relief as is just and proper.

### c. *The Lund's Fisheries Complaint*

The Lund's Fisheries plaintiffs, all New Jersey residents, are "owners of fishing vessels who participate in the monkfish fishery ... and processors who purchase and sell fish from those vessels." Complaint, ¶ 1. They, too, are sink gillnet fishers and hold or have applied for limited access permits to fish for monkfish and other species off of the New Jersey and Mid–Atlantic coasts.

Count I of this complaint alleges that the MFMP regulations violate 16 U.S.C. § 1851(a)(2) in that they "fail to use the best scientific information available because, among other things, the Secretary's designees ignored their own conclusions and fishermen's logbook information that demonstrated that the challenged gillnet gear restrictions will not have the stated monkfish conservation effect, and ignore historical (sic) development of the fishery." Complaint, ¶¶ 48–54.

Count II asserts a violation of 16 U.S.C. § 1851(a)(4) because the "MFMP unfairly singles out Plaintiffs, and others who harvest monkfish using gillnets, for a virtual ban on monkfish fishing by gillnets and such measure lacks any rational or demonstrable conservation basis. Further, because the southern fisheries for monkfish developed later, local fishermen do not qualify, and fishermen from other regions, who have not previously fished in these areas, are allocated greater rights." Complaint, ¶¶ 55–57.

In Count III, the Lund's Fisheries plaintiffs decry a violation of 16 U.S.C.

§ 1851(a)(5) because the MFMP regulations "operate solely to allocate the ability to fish for monkfish based on gear type or geographic region, and the economic benefits to be accrued therefrom, to fishermen not affected by the challenged gear restriction." Complaint, ¶¶ 58–60.

Count IV is a blanket allegation that the defendants "abdicated [their] statutory obligation to review in substance the NEFMC's [New England Fishery Management Council's] and MAFMC's [Mid Atlantic Fishery Management Council's] recommendation for the MFMP" thereby violating 5 U.S.C. § 706(2). Complaint, ¶¶ 61–63.

Count V is a due process claim pursuant to the 14th Amendment to the United States Constitution, alleging a deprivation of property. Complaint, ¶¶ 64–66.

In Count VI, the Lund's Fisheries plaintiffs state that they are "small entities" as defined by the Regulatory Flexibility Act ("RFA"), codified at 5 U.S.C. § 611(a)(1), and that the RFA "require[s] the Secretary and his designees to complete an initial regulatory flexibility analysis (IRFA) which describes any significant alternatives to the proposed rule which 'accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities.'" Complaint, ¶¶ 68, 70 (citing 5 U.S.C. § 603(c)). Because defendants did not complete this IRFA sufficiently or solicit sufficient public comment about it, plaintiffs allege that defendants failed to conduct an adequate final regulatory flexibility analysis "including an analysis of potential alternatives developed through the IRFA process." Complaint, ¶ 71 (citing 5 U.S.C. § 604).

The Lund's Fisheries plaintiffs request an order from this court declaring "that the control dates, qualification periods, qualification criteria, gillnet monkfish trip limit, days at sea limit, gear restrictions and trip limits ... [are] arbitrary, capricious, [and] an abuse of discretion." Complaint, Prayers for Relief, ¶ 1. They further ask this court to do the following: set the gillnet monkfish trip limit aside and make the trip limit the same for all gear types; suspend the limited access provisions of the MFMP until the control/qualification dates have been extended to take into account regional distinctions; declare that the MFMP regulations violate the RFA; order the defendants to undertake an IRFA; award plaintiffs their costs and attorneys' fees; enter a preliminary injunction preventing the defendants from enforcing the limited access and separate gillnet trip limit pending a hearing on the merits; schedule a hearing on the merits; and award such other relief as the court deems just and proper. *Id.*

### d. *The McCann Complaint*

Plaintiff William P. McCann is a resident of Wareham, MA, and the owner and operator of the F/V Melissa Sue. Complaint, ¶ 25. McCann holds a limited access monkfish permit and engages in sink gillnet fishing for monkfish. *Id.* Plaintiff Captain W.P. McCann, Inc. is a Massachusetts corporation and owns and operates the F/V Pilgrim, a fishing vessel engaged in monkfish fishing. *Id.* The six counts of the McCann complaint are identical to the six counts of the Lund's Fisheries complaint.

### e. *Background and Statutory Framework of the Magnuson–Stevens Act*

Congress enacted the Magnuson Act (later renamed the Magnuson Stevens Act) in 1976 "intend[ing] to respond to overfishing and inadequate conservation measures which were threatening future commercial and recreational fishing, as well as the very survival of species." *Parravano v.*

*Babbitt,* 837 F.Supp. 1034, 1040 (N.D.Cal. 1993), aff'd, 70 F.3d 539 (9th Cir.1995), cert. denied, 518 U.S. 1016, 116 S.Ct. 2546, 135 L.Ed.2d 1066 (1996) (citing 16 U.S.C. § 1801(a)); *Lovgren v. Byrne,* 787 F.2d 857, 861 (3d Cir.1986) (Magnuson Stevens Act "was enacted at a time when overfishing of coastal waters was commonplace, threatening the existence of a number of species of fish."). In order to render more efficient the management process provided for in the Magnuson Stevens Act, Congress also "created eight regional fishery management councils composed of state fishery managers, the regional NMFS [National Marine Fisheries Service] fisheries administrator, and qualified fishing industry, academic, and environmental representatives." *A.M.L. International, Inc. v. Daley,* 107 F.Supp.2d 90, 93 (D.Mass. 2000) (citing 16 U.S.C. § 1852(a)(1)). Each council controls the fisheries seaward of the states comprising it, and the primary responsibility of the councils is the development of fishery management plans that establish the rules for each fishery and meet national conservation and management standards established in the Magnuson Stevens Act. *Id.* (citing 16 U.S.C. § 1852(h)).

The rationale for the changes to the Magnuson Stevens Act that occurred in 1996 are best summarized by the following language from the *A.M.L.* case:

In 1996, Congress ushered in a new era in fisheries management by making significant revision to the Magnuson Stevens Act through the Sustainable Fisheries Act. *See* Pub.L. No. 104–297, 110 Stat. 3559 (1996). The Magnuson Stevens Act was revised because, "it was very clear that major changes were needed. Despite numerous efforts to improve the law over the past two decades, the sad reality [was] that the act did not prevent the current crisis in ... groundfish stocks, a crisis for the con-servation of both fish stocks and fishing families." *See* 142 Cong. Rec. H11418, 11439 (September 27, 1996) (statement of Rep. Studds). Indeed, Congress recognized that revisions to the Magnuson Stevens act were critical in order to "put our fisheries back onto a sustainable path and literally avert an environmental catastrophe on a national level.... We are precariously close to fisheries failures in many of our most commercially important fish stocks, and it is imperative that we take immediate action if we are to avert disasters." *See* 142 Cong. Rec. S10794, 10811–12 (September 18, 1996) (statement of Sen. Kerry).

*Id.* at 93–94. Under the modified Magnuson Stevens Act, if the Secretary of Commerce determines that a fishery is overfished, the Secretary must notify the appropriate fishery council, and request that action be taken to end overfishing in the fishery and to implement conservation and management measures to rebuild affected stocks of fish. *See* 16 U.S.C. § 1854(e)(2); 50 C.F.R. § 600.310(e)(2). Once the council has been notified, it has one year to prepare a fishery management plan that ends overfishing and rebuilds the stocks. *See* 16 U.S.C. § 1854(e)(3); 50 C.F.R. § 600.310(e)(3).

When a council submits its fishery management plan to the Secretary of Commerce, the Secretary (often acting through NMFS) must review the plan immediately to ensure its compliance with the ten "National Standards" and any other relevant provisions of the Magnuson Stevens Act, as well as any other pertinent laws. *See* 16 U.S.C. §§ 1851(a)(1–10), 1854(a)(1); 50 C.F.R. §§ 600.310–600.355. Furthermore, the Secretary must also accept public comment on the plan for sixty days. *See* 16 U.S.C. § 1854(a)(1)(B). Lastly, the Secretary must approve, disapprove or partially

approve the plan within thirty days of the end of the public comment period. *See* 16 U.S.C. § 1854(a)(3). "The Magnuson Stevens Act's main thrust is to conserve the fisheries as a continuing resource through a mixed federal-state regime; the FMPs are proposed by state Councils but the final regulations are promulgated by the Secretary through the Fisheries Service." *Massachusetts v. Daley,* 170 F.3d 23, 27–28 (1st Cir.1999).

### f. *Administrative Background of the MFMP*

After having determined that the monkfish had been overfished and after NMFS concluded that the monkfish "resource is at least heavily exploited and that the possibility of over-exploitation should not be ruled out," Record, 7314, the Secretary of Commerce delegated authority to the New England Fishery Management Council and the Mid Atlantic Fishery Council ("the Councils") to develop a plan to ameliorate the plight of the dwindling monkfish stocks. Defendants' Motion, P. 4. Because of the monkfish's wide geographic range and in order to account for the variation in the monkfish's biological characteristics from region to region, the Councils created two management areas, the Northern Fishery Management Area ("NMFA") and the Southern Fishery Management Area ("SMFA").[10] *Id.*

In creating and adopting the MFMP, the Councils decided upon four management goals: (1) to end and prevent overfishing, by rebuilding and maintaining a healthy spawning stock; (2) to optimize yield and maximize economic benefits to the various fishing sectors; (3) to prevent increased fishing on immature fish; and (4) to allow the traditional incidental catch of monkfish to occur. Record, 7244. Os-

tensibly in furtherance of one or more of these objectives, the final rule prescribed landing limits for vessels holding limited access monkfish permits, which went into effect on May 1, 2000. These limitations, as stated earlier, provide that Category A and C vessels using trawl gear may land up to 1,500 lbs. of monkfish tail-weight per day at sea, while vessels using any gear other than trawl or "mobile" gear may land up to 300 lbs. of monkfish tail-weight per day at sea. *See* 50 C.F.R. § 648.94(b)(2)(iii), (v). The legality of these limitations is the crux of the dispute.

*Issues*

1. What is the standard of review that applies to a motion for summary judgment?

2. What is the standard of review that applies to the MFMP regulations, as prescribed by 16 U.S.C. § 1855(f)(1)(B) and 5 U.S.C. § 706(2)(A), (B), (C), and (D)?

3. Do the regulations comply with National Standard Two of the Magnuson Stevens Act, pursuant to 16 U.S.C. § 1851(a)(2), which requires that the regulations be based upon the best scientific information available?

4. Do the regulations comply with National Standard Four of the Magnuson Stevens Act, pursuant to 16 U.S.C. § 1851(a)(4), which requires that any allocation or assignment of fishing privileges among various United States fishermen be fair and equitable, reasonably calculated to promote conservation, and carried out in such a manner that no particular individual corporation or other entity acquires an excessive share of such privileges?

---

**10.** The NFMA "includes the fishery north of the southern shore of Cape Cod, Massachu-

setts, and the [SFMA] is all of the fishery south of that line." Defendants' Motion, P. 4.

5. Do the regulations comply with National Standard Five of the Magnuson Stevens Act, pursuant to 16 U.S.C. § 1851(a)(5), which requires that the regulations shall, where practicable, consider efficiency in the utilization of fishery resources, except that no regulation shall have economic allocation as its sole purpose?

6. Has the Secretary of Commerce conducted a substantive review of the Councils' recommendation, as required by 16 U.S.C. § 1854(a)(1)(A)?

7. Do the regulations violate the RFA, pursuant to 5 U.S.C. §§ 603–604, which requires the defendants to complete an initial regulatory flexibility analysis describing any significant alternatives to the proposed rule and why those alternatives were discarded?

8. If the regulations violate any applicable law, what should be the remedy?

*Analysis*

a. *Summary Judgment Standard*

The parties have cross-moved for summary judgment. Federal Rule of Civil Procedure 56(c) states that a party shall be entitled to a summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). When determining a motion for summary judgment, I must review the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. *Mesnick v. General Electric Co.*, 950 F.2d 816, 820 (1st Cir.1991) *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990).

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993); *Lawrence v. Northrop Corp.*, 980 F.2d 66, 68 (1st Cir.1992).

Summary judgment is a procedure that involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party meets this burden, the onus falls upon the nonmoving party, who must oppose the motion by presenting facts that show that there is a "genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing Fed.R.Civ.P. 56(e)); *see Goldman*, 985 F.2d at 1116; *Lawrence*, 980 F.2d at 68; *Garside*, 895 F.2d at 48 ("[A] 'genuine issue' exists if there is 'sufficient evidence supporting this claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial.'" (citing *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976))).

To oppose the motion successfully, the nonmoving party "may not rest upon mere allegation or denials of his pleading." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Moreover, the evidence presented by the nonmoving party " 'cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of

the truth which a factfinder must resolve at an ensuing trial.' " *Mesnick,* 950 F.2d at 822 (citing *Mack v. Great Atl. & Pac. Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989)). Indeed, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990). In order to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." *Goldman,* 985 F.2d at 1116 (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505).

b. *Standard of Review Applicable to the MFMP Regulation as Prescribed by the Magnuson–Stevens Act and the APA*

■ 16 U.S.C. § 1855(f)(1) states the following:

Regulations promulgated by the Secretary under this chapter ... shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of Title 5, if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable; except that ...

(B) the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of such Title.

As stated earlier, 5 U.S.C. § 706(2)(A)-(D) provides that a court may hold unlawful and set aside agency action, findings, and conclusions if they are: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or (D) without observance of procedure required by law. The court must defer to the interpretation of a statute by the agency charged with administering it, and the standard under 5 U.S.C. § 706(2) presumes the agency action to be valid. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Southern Cal. Edison Co. v. F.E.R.C.,* 770 F.2d 779, 782 (9th Cir.1985). Although the court's inquiry is to be searching and careful, the ultimate standard of review is a narrow one. *See Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. The role of the reviewing court is to " 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment.' " *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (citing *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814). "A reviewing court may decide only whether [the Secretary's] discretion was exercised rationally and consistently with the standards set by Congress ... and may not substitute its own judgment as to values and priorities for that of the Secretary." *Maine v. Kreps,* 563 F.2d 1052, 1055 (1st Cir.1977). "With respect to a court's review of a specific regulation adopted by an agency pursuant to its delegated authority,

[the] regulation will be found to be arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise.'"
*Connecticut v. Daley,* 53 F.Supp.2d 147, 157 (D.Conn.1999) (citing *Southeastern Fisheries Ass'n, Inc. v. Mosbacher,* 773 F.Supp. 435, 439 (D.D.C.1991) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443)). Where an agency action is taken upon an administrative record, it must be reviewed based only on that record, subject to limited exceptions. *Massachusetts v. Daley,* 170 F.3d at 27 n. 4 (citing *Sierra Club v. Marsh,* 976 F.2d 763, 772–73 (1st Cir.1992)).

■ Courts reviewing the Secretary of Commerce's actions in the context of the Magnuson Stevens Act have acknowledged that "the Secretary has broad discretion in promulgating regulations to implement the [FMP]." *See Southeastern Fisheries,* 773 F.Supp. at 439. The Secretary's assessment of which fishery conservation and management measures would be in the nation's best interest is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *National Fisheries Institute, Inc. v. Mosbacher,* 732 F.Supp. 210, 223 (D.D.C.1990). Therefore, "[f]or a court to set aside the Secretary's action, it 'must find that the administrative record is so devoid of justification for the Secretary's decision that the decision is necessarily arbitrary and capricious.'" *Connecticut v. Daley,* 53 F.Supp.2d at 158 (citing *J.H. Miles and Co., Inc. v. Brown,* 910 F.Supp. 1138, 1146 (E.D.Va.1995)). "When a regulation is not adequately supported, the normal practice is to set it aside pending further proceedings," though the court may alternatively order a remand to the agency for further explanation while leaving the regulation in force. *Massachusetts v. Daley,* 170 F.3d at 32 (citing *Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)).

### c. *National Standard Two*

16 U.S.C. § 1851(a)(2) provides the following:

> Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards for fishery conservation and management:
>
> · · ·
>
> (2) Conservation and management measures shall be based upon the best scientific information available.

50 C.F.R. § 600.315(b)(1) illustrates various types of data that might constitute the "best scientific information available:"

> Scientific information includes, but is not limited to, information of a biological, ecological, economic, or social nature. Successful fishery management depends, in part, on the timely availability, quality, and quantity of scientific information, as well as on the thorough analysis of this information, and the extent to which the information is applied. If there are conflicting facts or opinions relevant to a particular point, a Council may choose among them, but should justify the choice.

■ Plaintiffs contend that defendants or their designees "did not scientifically analyze the potential conservation effect of the 300 lb trip landing allocation," and that the "Secretary in this instance has failed to present any scientific analysis to support the gear landing allocation.... [T]here is no evidence to support a trip allocation between mobile gear and fixed gear types." Plaintiffs' Motion, PP. 8–9. Furthermore, plaintiffs state that the rationale for the different allocations in the MFMP was "nothing more than a compromise. The Monkfish Committee has stated that prior to the implementation of the rule,

there was no reasonable rationale for one gear type to be allocated a different amount than another gear type." *Id.* at P. 9.

Defendants argue that plaintiffs "do not accurately describe the effect of that regulation [50 C.F.R. § 600.315(b)(1) ], incorrectly portraying it as a requirement that NMFS conduct a new scientific study to support the conclusions in the FMP." Defendants' Motion, P. 15. Instead, defendants insist that:

> Even a cursory review of the MFMP flatly contradicts any claim that the Councils evaluated (sic) the best scientific information available. Among much other information, the Plan analyzed:
>
> — monkfish landings and revenues from 1964 to 1997.
>
> — landings of monkfish livers from 1982 to 1997.
>
> — average annual landings of monkfish, 1992–1996.
>
> — monkfish landings by vessels using different types of gear.
>
> — permit, revenue and fishing effort information of various kinds.
>
> — monkfish mortality and maturity data.

*Id.* at P. 16 (citations omitted). Defendants also cite extensively from the Plan's language relying upon a recent Stock Assessment Workshop ("SAW") analysis, which aims to "evaluat[e] the status of a fishery [here, monkfish]" by examining "a combination of data generated by the fishery and survey data from trawl surveys conducted at sea by NMFS." [11] *Id.* at PP. 16–17. Based on "the above-described sort of scientific information," and their understanding that "nothing in the Magnuson Act requires NMFS to scientifically analyze (sic) the effect of conservation measures," defendants argue that the rationale for different allocations for fixed and mobile gear is founded upon the best scientific information available. *Id.*

Despite the purported ocean of scientific information supporting the different gear allocations, there is no evidence offered by the defendants (or otherwise present in the stipulated to administrative record or in the errata submitted by defendants) that provides any scientific basis for the regulation. I take each of the defendants' assertions in turn. First, defendants point to the data at PP. 7228 and 7229 of the Record. Record, 7228 is a table of monkfish landings and revenues from 1964 to 1997, listing among other things the total live weight (in millions of pounds) caught and price per pound, by live weight and tail weight, of the monkfish throughout the years. The data shows a steady increase

11. Record, 7252 provides the following:
The most recent detailed stock assessment was conducted by SAW 23 during the fall of 1996. This assessment used fishery-dependent and survey data through the end of 1995 to evaluate the status of the monkfish resource. The estimates of fishing mortality trends from 1963 to 1995 were analyzed in 5 year blocks to smooth the interannual variation that occurs in a randomized survey. Adding 1997 data would not radically alter the estimates of fishing mortality, although the proportion of monkfish at a larger size may still be declining.
In addition to the above survey-based estimates, the 21st SAW included monkfish within its comprehensive assessment of the northeast demersal finfish complex. Most of the analyses in the comprehensive assessment were intended to show broad, long-term trends that were consistent across species. The monkfish indices were not classified by management area, but showed a decline to low levels of biomass through 1987. Since that time, biomass has fluctuated without trend at low levels, while abundance has increased in the Northern Fishery Management Area. The more recent information does not contradict the conclusion of SAW 23 that monkfish are at least fully-exploited and might be over-exploited.

both in monkfish landings (from 0.1 million pounds in 1964 to 57.5 million pounds in 1997) and in the price of monkfish per pound (from $0.03 per pound tail weight in 1964 to $1.83 per pound tail weight in 1996).[12] Record, 7229 presents a chart documenting the landings of monkfish livers and the revenues (in toto and per pound) therefrom derived from 1982 through 1995. It, too, indicates a steady increase in the market for monkfish liver and the concurrent increase in price during this period. While this information might edify the reader's curiosity regarding the landing of monkfish (and their livers) over an extended period and the corresponding revenues, it does little if anything to explain the reasons for a regulation that limits gillnet fishers to a monkfish catch of 300 lbs. per day while permitting trawler gear fishers to catch 1,500 lbs. of monkfish per day. This court cannot discern or infer, nor have defendants argued, any reason that the gillnet fishers, because monkfish as a species and monkfish liver has increased in popularity and cost, should now be prevented from catching anymore than 300 lbs. of monkfish per day, while their trawling brethren are not so limited. It is certainly beyond dispute that a landing limitation for all types of fishing gear, where previously there existed none, would ameliorate stock levels and depletion statistics. Plaintiffs readily concede this point. Plaintiffs' Motion, P. 3 ("To be clear, the plaintiffs do not dispute the need for fishing conservation measures to ensure the viability of monkfish, but they do want uniformity and fairness implemented in any such regulation, including trip limits."). As plaintiffs themselves state, the crux of this claim rests in the absence of a scientific basis for the trip limit differential by gear type, and no information contained at Record, 7228 or 7229 fills this void.

Second, defendants state that the data contained at Record, 7290, indicating average landings of monkfish from 1992–1996 supports the gear allocation differential. Defendants' Motion, P. 16. The information at Record, 7290 presents the following chart:

Table 9. Average annual landings of monkfish, 1992–1996. Source: NMFS

| State | Pounds, thousands | Revenue ($1,000) |
|---|---|---|
| Connecticut | 1,083 | 501 |
| Delaware | 24 | 11 |
| Maine | 4,081 | 2,179 |
| Maryland | 64 | 56 |
| Massachusetts | 12,358 | 6,832 |
| New Hampshire | 295 | 224 |
| New Jersey | 1,798 | 1,038 |
| New York | 603 | 299 |
| North Carolina | 152 | 114 |
| Rhode Island | 3,571 | 2,114 |
| Virginia | 979 | 383 |
| Grand Total | 24,946 | 13,752 |

This document illustrates the breakdown of the monkfish fishing business by state, averaged between the years 1992–1996. There is no question, nor do the parties dispute, that the monkfish market is a burgeoning one, and it is interesting that plaintiffs in this case reside and do their commercial fishing in states with a considerable monkfish fishery. But these

12. Though each year did not always eclipse the prior year: note the market drops in 1989–1990, 1996–1997.

statistics do nothing to justify the day trip differential at issue here: there is no reason provided, nor is there reason to assume, that a 300 lb. per day cap for gillnets and a 1,500 lb. per day cap for trawlers derives its scientific basis from an itemized breakdown, state by state, of the monkfish fishery between the years 1992–1996. There is no correlation at all between the data and the differential: why not, for example, a 300 lb. limit for all types of gear, or an across-the-board 1,500 lb. limit? Both of these alternatives would also assist in restocking dwindling or threatened monkfish supplies. No rational, scientifically based explanation for the differential is offered by Record, 7290.

Third, defendants cite to Record, 7320 and 7321 for the proposition that data describing "monkfish landings by vessels using different gear types" adequately explains the day at sea gear trip differential. Defendants' Motion, P. 16. Three charts found at these pages offer the following information:

Table 13. Monkfish landings by vessels using otter trawl gear, 1991–1996. Source: NMFS

Landings (mt)

| State | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|
| Maine | 1,353 | 2,093 | 3,009 | 4,152 | 4,226 | 4,101 |
| N. Hampshire | 50 | 57 | 69 | 70 | 46 | 26 |
| Massachusetts | 1,853 | 2,125 | 2,265 | 5,424 | 7,963 | 6,545 |
| Rhode Island | 2,683 | 2,850 | 1,696 | 2,192 | 1,607 | 2,962 |
| Connecticut | 380 | 381 | 1,592 | 462 | 500 | 898 |
| New York | 199 | 289 | 239 | 480 | 359 | 667 |
| New Jersey | 222 | 519 | 337 | 193 | 161 | 145 |
| Delaware | | | | | | |
| Maryland | 12 | 6 | 7 | 6 | 14 | |
| Virginia | 178 | 92 | 65 | 112 | 492 | 155 |
| North Carolina | 50 | 12 | 31 | 101 | 185 | 58 |

Table 14. Monkfish landings by vessels using scallop dredge gear, 1991–1996. Source: NMFS

Landings (mt)

| State | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|
| Maine | 31 | 47 | 78 | 20 | 48 | 9 |
| N. Hampshire | | | | | | |
| Massachusetts | 3,374 | 4,827 | 6,433 | 4,806 | 4,322 | 3,759 |
| Rhode Island | 266 | 255 | 216 | 7 | 42 | 36 |
| Connecticut | | | 626 | | | 195 |
| New York | | | 3 | | | |
| New Jersey | 554 | 797 | 827 | 440 | 425 | 582 |
| Delaware | | | | | | |
| Maryland | 1 | 7 | | | | |
| Virginia | 486 | 862 | 679 | 384 | 461 | 669 |
| North Carolina | 8 | 4 | | | | 6 |

Table 15. Monkfish landings by vessels using gillnet gear, 1991–1996. Source: NMFS

Landings (mt)

| State | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|

| Maine | 71 | 75 | 51 | 58 | 67 | 116 |
|----------------|-----|-----|-----|-------|-------|-------|
| N. Hampshire | 36 | 37 | 45 | 182 | 379 | 426 |
| Massachusetts | 310 | 485 | 835 | 2,016 | 2,012 | 1,966 |
| Rhode Island | 62 | 406 | 725 | 999 | 174 | 766 |
| Connecticut | | | | | | 162 |
| New York | 3 | 2 | 141 | 127 | 101 | 323 |
| New Jersey | 74 | 47 | 191 | 429 | 993 | 430 |
| Delaware | | | | | | |
| Maryland | | | 1 | 67 | 153 | |
| Virginia | | | | | | 31 |
| North Carolina | | | 5 | 37 | 54 | 175 |

The figures reported in these charts indicate consistently that otter trawling gear accounts for a greater percentage, over the years reported, of the total monkfish catch than scallop dredge gear and sink gillnet gear respectively.[13] The conclusion that this data supports the disputed regulations from a scientific perspective does not follow logically, however. The simple fact that fishers using otter trawling gear catch more monkfish than fishers using other gear provides no scientific reason to limit gillnetters to 300 lbs. per day while allowing trawlers 1,500 lbs. per day (though perhaps it does provide an economic reason).

Fourth, defendants claim that the "permit revenue and fishing information of various kinds" contained at Record, 7371, 7372, and 7382 offers strong scientific support for the regulation. Two of the charts (at 7371 and 7372) tabulate the number of fishing vessels that held various kinds of fishing permits (including multispecies, sea scallop, summer flounder, lobster, squid-mackerel butterfish, scup, black sea bass, tuna, and combinations thereof) in the Northeast region in 1997. The connection to be drawn with the gear allocation regulations is less than pellucid. Nothing in these charts supports scientifically the regulations at issue here. As for the chart at Record, 7382, this tabulates the total revenue and percent of monkfish landings by gear type from 1994–1997. Over the four

years surveyed, fish bottom trawlers accounted for 52.66% (1994), 54.79% (1995), 54.81% (1996), and 53.09% (1997) of monkfish landings. Scallop dredges accounted for 25.84% (1994), 19.89% (1995), 18.15% (1996), and 20.52% (1997) of monkfish landings. Gillnets accounted for 20.39% (1994), 23.48% (1995), 23.11% (1996), and 21.39% (1997) of monkfish landings. All other gear types (including surf clam dredges, fish pots, other types of bottom trawlers, midwater trawlers, coastal gillnets, other handlines, longlines, line trawlers, floating traps, inshore lobster pots, offshore lobster pots, pair trawlers, shrimp trawlers, other beam trawlers, shrimp beam trawlers, Scottish seine, Danish seine, and all other types) comprise, on the whole, less than 5% of the monkfish landings. This chart comports roughly with the information conveyed by the other tables listed above: we see that trawling gear accounts for roughly two to three times as much monkfish catch as scallop dredge gear and gillnet gear respectively. Again, however, it is not at all apparent how this data offers a scientific basis for the landing differential in the regulations at issue. If conservation and repletion of the monkfish stock is the aim here, then how does the gear trip differential promote that goal?

Next, defendants point to "monkfish mortality and maturity data" contained in Record, 273, 275, 277, as evidence that the best scientific information available sup-

---

**13.** Variations do occur, however, from state to state.

ports the gear differential. Record, 273 states four "Recommendations," none of which make any mention of the differences between gear types or the necessity for different gear trip limits. Also cited are various research texts or articles studying the habits of the monkfish. Record, 275 is a table detailing the number of trips landing monkfish from 1987 to 1991, and the percent of weight landed that comprised monkfish. Record, 277 is an arcane chart that appears to tabulate information from 1964–1991. The substance of this information is not disclosed, nor do defendants explain it anywhere in their papers, including the errata.

Plaintiffs emphasize the similarity of the case at bar to *Parravano v. Babbitt,* 837 F.Supp. 1034 (N.D.Cal.1993) and *Massachusetts v. Daley,* 170 F.3d 23 (1st Cir. 1999), both of which dealt with various regulations issued by the Secretary of Commerce that were ultimately held to violate National Standard Two. In *Parravano,* the plaintiffs (commercial fishermen and fishing associations) contended that the Secretary of Commerce "improperly reduced, by way of an emergency regulation, the Klamath chinook ocean harvest rate for the fall fishing season," contravening the recommendation of the Pacific Fishery Management Council ("PFMC"). *Parravano,* 837 F.Supp. at 1039. As here, actions taken by the Secretary of Commerce pursuant to the Magnuson Stevens Act were subject to limited judicial review, in that a court could only invalidate a challenged regulation pursuant to the four criteria of 5 U.S.C. § 706(2). *Id.* at 1042. Plaintiffs asserted that the Secretary's deviations from the PFMC's recommendations "find no support in the Administrative Record.... [T]he Secretary lacks any rational basis for finding that his emergency regulation comports with National Standard Two." *Id.* at 1046. The court agreed with the plaintiffs, stating:

[T]he particular manner by which the Secretary chooses to address the problem must have some support in the Administrative Record, such that the Secretary may reasonably conclude that his chosen method is consistent with Magnuson Act National Standards, including National Standard Two. We conclude that while there may well be adequate support for the specific approach taken by the Secretary, it is not apparent in the current record which provides only conclusory assertions.... For example, the Secretary, through his representatives, has stated that the higher 38,000 escapement floor represented his "best estimate" of the way to achieve his objectives while minimizing social and economic impacts. The Secretary, however, has not pointed to anything in the record which specifically explains why this is his "best estimate" or how it is based on the "best scientific information available."

*Id.* (citations omitted). Furthermore, the *Parravano* court noted the following with respect to the role of political compromise in the crafting of regulations:

There is nothing improper with compromise per se. Indeed, much of the Magnuson Act process is designed to facilitate compromise between various competing interests. However, the purpose of the Magnuson Act is to ensure that such compromise decisions are adequately explained and based on the best scientific evidence available- and not simply a matter of compromise.

*Id.* at 1047 (citations omitted). Defendants argue that *Parravano* is inapposite because (1) the Record prepared by the Councils in this case was based upon the best scientific evidence available and supported the gear differential; (2) the Secretary in this case did not deviate from the

proposal of the Councils; and (3) defendants do "not concede that the gill net trip limit was the result of a political compromise" as was conceded in *Parravano*. Defendants' Motion, P. 18.

I find plaintiffs' arguments more compelling, principally because there is no discernible, substantive scientific evidence in the Record that supports the gear differential regulations. Defendants have not evinced even one scintilla of scientific information that supports the regulations. The "rationale" defendants cite, at Record, 7274, which states that "[t]he trip limits are expected to contribute to mortality reduction and achieve the biological objectives in year two" is nothing more than a conclusory prediction. Such an assertion

in no way informs its audience of the scientific foundation supporting it.

There is copious evidence, despite defendants' protestations to the contrary, that the underlying rationale for the gear limitation differential was motivated by the spirit of compromise.[14] Defendants themselves concede that the idea of an across-the-board 300 lb. trip limit for all gear types was initially contemplated by the Councils. Defendants' Motion, P. 13 (citing Record, 4563, 4662). Ultimately, it appears that the uniform trip limit for all gears was rejected in large part because trawling gear is responsible for catching significantly greater numbers of monkfish than is gillnet gear, and a 300 lb. uniform trip limit would, thus, affect the trawling industry much more severely than the gillnet industry.[15] Defendants state that rep-

14. The following exchange between members of the New England Council is illuminating:

John Williamson: In year two or soon after a full fishing year of landings data are available after plan implementation if all trip limits for monkfish qualifiers of 300 pounds per day for fixed gear and 1,000 pounds per day for mobile gear, will be imposed in the southern fishery management area. I was just curious as to why the very large discrepancy between the two gear types.

Eric Smith: That was a proposal to try and find something that was restrictive enough to get us back toward something where our year one target should be, which is about a 50 percent reduction in landings from the base period. The 300 has been talked about a lot by smaller boat gillnet fishermen as something that would be restrictive, but liveable. The problem with the mobile gear is there's a lot of diversity there. There's large boats that fish deepwater offshore that catch a lot more than 1,000 ponds (sic) a day, which is why you need the running clock, and then there are smaller-then there are smaller boats that arguably can live on the 1,000 pounds a day. It's a step down from no trip limit to the year four default measures, which are essentially no directed fishery, just the 25% or 300 pound bycatch. So there are kind of intermediate levels and **you know how compromises go, people wrestled a lot and fi-**

**nally by motion and approval decided to pick those numbers. It's not an analytical result as much as it's a compromise to try and get us to an intermediate point that helps us to achieve that objective.**
Record, 5299 (emphasis supplied).

15. Note the following comments by various members of the Councils:

. . . [W]hat's necessary to make a profitable trip for a gill net vessel is different than what's necessary to make a profitable trip for a scallop vessel, which is, again, different than what a deep trawler vessel needs. Anthony DiLernia, Record, 4842.

Now, if we start getting into uniform trip limits and things like that, now, we have to restart the debate about what is a reasonable number for a five-man boat making a ten-day trip versus a 35 foot boat making-with two men making a one-day trip, and if we want to go around and around and around on that again, we'll be here a year from now. Jim O'Malley, Record, 4844.

. . . the compromise position is one in which there are still no trip limits in year one for any-for the directed fishery, for any sector, but that in year two, should the TAC [Total Allowable Catch] in year one be exceeded, then in year two there are default trip limits of 300 pounds for fixed gear and 1,000 pounds for mobile gear sector-that is

resentatives of the gillnet industry agreed to the 300 lb. trip limit restriction as a "rational approach to [avoid] more restrictive measures later," but a close reading of the comments discloses that while there may have been agreement about the trip limit itself, there was not necessarily agreement about the differential between gear types:

> See, we want 300 pounds a day, tails, 40 days-at-sea, and we're willing to start that next year or whenever so we can stay in business. We don't want to slaughter 'em, catch all we can catch, set tons of net for three years and then get thrown out. It does us no good to fish. We don't want to fish like that. It's dangerous, it's just not right. And the near-shore directed boats . . . or more in the Mid Atlantic, we would like to see 300 pounds a day right off the bat.

Kevin Wark, Record, 4839.

■ Further complicating the issue are comments made by Chairman Barbara Stevenson at an August 30, 2000 Monkfish Committee Meeting, indicating that the

only initial rationale for the gear differential lay in a geographic separation between "deep water fishery" or "offshore fishery" and "inshore fishery." [16] *See* Plaintiff's Statement of Material Facts, ¶ 98, Exh. A, October 20, 2000. This offshore/inshore distinction was eventually discarded by the Councils, and was not made part of the final MFMP, but the gear differential remained a part of the final plan:

> The Chairman: Do you want me to explain it again?

> Mr. (Philip) Herring: Yes, please

> The Chairman: The construction of the current plan was set up so that the deep water fishery could occur, and part of that was this differential allocation; part of it was the running clock. And when the running clock was disapproved, the deep water fishery could no longer occur. We still had the [gear] differential, which had disadvantages which had become more obvious. So the question now is, how do we get to a situation where

for directed fishing. Anthony DeLernia, Record, 5352.

16. In the main, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. at 142, 93 S.Ct. 1241. However, this Circuit has recognized that

> [t]he fact that review sometimes or often focuses on the initial administrative record does not mean it always must, or always will do so. It could happen that a particular instance of judicial review of [a regulation] raises a "genuine" and "material" dispute of facts that requires a trial: Did the agency know, for example, about some important matter that the [regulation] ignored (and which the commenting parties did not know about and could not have pointed out?). Or, did the agency improperly rely upon some other important, but secret, information not part of the record? Moreover, a reviewing court might want addi-

tional testimony by experts, simply to help it understand matters in the agency record; indeed, it might ask for additional factual evidence as an aid to understanding. However desirable this kind of evidentiary supplementation as an aid to understanding highly technical, environmental matters, its use is discretionary with the reviewing court.

*Valley Citizens for a Safe Environment v. Aldridge*, 886 F.2d 458, 460 (1st Cir.1989); *see Sierra Club v. Marsh*, 976 F.2d 763, 772 (1st Cir.1992) ("The administrative record may be 'supplemented, if necessary, by affidavits, depositions, or other proof of an explanatory nature.'") (citing *Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 357 (8th Cir.1984)). Because this case involves highly technical environmental issues, and because the Record evidence in support of the scientific viability of the regulations is scant at best, I recommend that the court review this extra-Record data to assist its evaluation of the regulations.

both the inshore and offshore fisheries can occur at approximately the same level of opportunity reduction.

Mr. Herring: I understand that, but you constructed it around the disadvantage of the offshore trawl fleet in light of the disapproval of the running clock?

The Chairman: Correct.

Mr. Herring: But I heard comments from other people who feel that their (sic) disadvantaged for different reasons because they have a lower trip limit anyway.

The Chairman: Because when the Council made the tradeoff of the differential, all the gill netters said at that point, fine. You know, 300 pounds is fine. And just, that was the information that the Council went on, and that (sic) the reason that it was more for trawlers and not for normal trawler operation. It was to accommodate the deep water fishery.

**So when the deep water fishery could no longer occur, the rationale for the differential disappeared. There is no longer a reasonable rationale for why one group should have a different amount than the other because the whole rationale was based on the deep water fishery.** Whether the Council did a good job of addressing that question, that was the question it was trying to address when it came up with the differential and the running clock.

Since the running clock was disapproved, we need to both address the issue of equitable reductions in all fisheries, and to address the obvious inequities that are more obvious now....

*Id.* at Exh. A, P. 155–56 (emphasis supplied). The substance of these comments indicates that any justification for the gear limit differential is now without basis, even from the standpoint of compromise. These statements demonstrate that the gear differential is the result of a defunct compromise, not rooted in any analytical or scientific base. Just as in *Parravano,* the Secretary of Commerce has failed in "his duty to demonstrate, through concrete analysis, that he could rationally conclude that his approach would accomplish his legitimate objectives based upon the best scientific information available." *Parravano,* 837 F.Supp. at 1047. Though "the Magnuson Act permits the Secretary's designees to act on information that is incomplete or if there are differences in available information," it does not condone regulations promulgated entirely for the sake of compromise not braced by any scientific evidence. *J.H. Miles,* 910 F.Supp. at 1152; *see Southern Offshore Fishing Ass'n v. Daley,* 995 F.Supp. 1411, 1433 (M.D.Fla.1998) ("Judicial review at this juncture is limited to determining whether the Secretary intelligently and knowingly decided on a rational policy, given the scientific and judgmental tools available to him.").

In *Massachusetts v. Daley,* the Commonwealth brought an action to review a decision of the Secretary of Commerce adopting a revised quota for catching scup off the east coast of the United States. *Massachusetts v. Daley,* 170 F.3d at 25. As in this case, the Commonwealth conceded that scup stocks were "severely depleted," but contested a state-by-state summer fishing quota system implemented by the Secretary. *Id.* at 28. The evidence indicated that the data used to fashion the quota system undercounted scup that were caught closer to shore, and Massachusetts fishermen were clearly and unjustifiably disfavored by the regulation. In affirming the district court's ruling that the quota was unlawful, the First Circuit stated:

If the state-by-state quotas were shown to be necessary to achieve the main conservation goal, we would decide the case in favor of the Secretary.... The most troublesome fact for the Secretary is that very little appears, whether in the Council minutes or in the public comments or in the Secretary's notices, to explain why the state-by-state quota is necessary at all. The state-by-state quota seems to have been adopted by the Secretary, as part of the overall summer quota, with almost no explicit explanation for its purpose by the Secretary.... Where a regulation is not adequately supported, the normal practice is to set it aside pending further proceedings.

*Id.* at 30–32 (citing *Camp v. Pitts,* 411 U.S. at 143, 93 S.Ct. 1241). Defendants argue that the circumstances of *Massachusetts v. Daley* "contrast sharply with the case at bar, where the administrative record contains many discussions about the necessity of trip limits, and moreover ... for different limits based upon gear types." Defendants' Motion, P. 19.

I do not agree. No information cited by the defendants demonstrates any scientific justification for the gear trip differential. Indeed, some information contained in the MFMP (admittedly without the support of accompanying migration studies) indicates that gillnet fishermen often target more mature monkfish in shallower waters "when [the monkfish] are making short, seasonal migrations, often to spawn. Larger fish are more likely to be spawning, and they may as a result be moving further than their smaller counterparts.... Gillnets generally catch larger monkfish." Record, 3552–3553, 6862–6863. By contrast, trawlers appear to catch smaller, less mature monkfish: "Most of the trawl catches would be smaller than the proposed 14 inch size limit.... [F]ishermen have reported that gillnets catch

larger monkfish than trawls or scallop dredges operating in the same area." *Id.* Though there are no studies cited that confirm these statements, this sort of analysis would indicate that a more stringent limitation on trawling gear would assist in restocking supplies by affording immature fish a chance to reach their sexual maturity. There is a scientific study at Record, 2365, 2376 which reports the following findings:

Maximizing yield per recruit and reducing to the lowest possible level the amount of recruitment overfishing that occurs are two methods of ensuring a healthy and sustainable fishery. Prospects for maximizing viability of the goosefish population would be enhanced by minimizing mortality of immature fish and allowing individuals to grow and spawn at least once before they are taken in the commercial fishery. Limiting the number of immature individuals taken in the fishery by placing minimum sizes on the landed fish and tails (guided by the data obtained in this study), restricting fishing areas, or modifying fishing gear will enhance the sustainability of the fishery.

Frank P. Almeida, Dana–Lyn Hartley, Jay Burnett, *Length–Weight Relationships and Sexual Maturity of Goosefish off the Northeast Coast of the United States,* 5 North American Journal of Fisheries Management 14, 25 (1995). Whatever the case, defendants have not provided any countervailing scientific evidence supporting the gear differential as it stands. At oral argument, the court asked defense counsel explicitly to articulate the scientific underpinnings for the gear differential allocation. Counsel stated that the scientific evidence consisted of the fact that gillnets are largely a directed monkfish fishery while trawlers fish monkfish primarily as bycatch. Counsel further stated that the

gear differential is justified by the historic participation in the monkfish fishery by gillnet and trawl gear types. Neither of these arguments offer this court a viable scientific justification for the gear differential allocation. The fact that gillnetters may target monkfish to a greater extent than do trawlers does not necessarily indicate that gillnets are more harmful to the monkfish stock than are trawlers. Defendants themselves have provided the court with considerable Record evidence that trawlers catch significantly greater numbers of monkfish than do gillnets, whether targeted or not. And as for the historical participation of each gear type, this is not a scientific argument at all—merely an historic one. Just as in *Massachusetts v. Daley*, very little appears in the administrative record to explain the scientific rationale for the challenged regulations. The decision to make the gear differential part of the MFMP is in fact an arbitrary one when measured against the language of National Standard Two.

### d. *National Standard Four*

Plaintiffs also assert that the regulation does not comply with National Standard Four of the Magnuson Stevens Act, which provides, in relevant part:

> If it becomes necessary to allocate or assign fishing privileges among the various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such a manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(a)(4). 50 C.F.R. § 600.325(c)(1) defines an allocation of fishing privileges as

> a direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user

groups or individuals.... [O]nly those measures that result in direct distribution of fishing privileges will be judged against the allocation requirements of Standard 4.... Allocations of fishing privileges include, for example, per-vessel catch limits, quotas by vessel class and gear type....

Again, the court takes the position that "unless the Secretary acts in an arbitrary and capricious manner in promulgating such regulations, they may not be declared invalid." *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987). The parties appear not to dispute that 50 C.F.R. § 648.94(b)(2) allocates fishing privileges by establishing quotas by gear type. Therefore, I now address each requirement triggered by such an allocation.

### i. *Are the regulations fair and equitable?*

In assessing whether or not the challenged regulations are fair and equitable within the meaning of the Magnuson–Stevens Act, the court is guided by the following language:

> (A) An allocation of fishing privileges should be rationally connected to the achievement of OY [Optimum Yield] or with the furtherance of a legitimate FMP objective. Inherent in an allocation is the advantaging of one group to the detriment of another. The motive for making a particular allocation should be justified in terms of the objectives of the FMP; otherwise, the disadvantaged user groups or individuals would suffer without cause. For instance, an FMP objective to preserve the economic status quo cannot be achieved by excluding a group of long-time participants in the fishery. On the other hand, there is a rational connection between an objective of harvesting shrimp at their maximum

size and closing a nursery area to trawling.

(B) An allocation of fishing privileges may impose a hardship on one group if it is outweighed by the total benefits received by another group or groups. An allocation need not preserve the status quo in the fishery to qualify as "fair and equitable," if a restructuring of fishing privileges would maximize overall benefits. The Council should make an initial estimate of the relative benefits and hardships imposed by the allocation, and compare its consequences with those of alternative allocations schemes, including the status quo . . . .

50 C.F.R. § 600.325(c)(3)(i)(A-B). Plaintiffs argue that "NMFS failed to demonstrate how the conservation goal would be promoted with the a(sic) different allocation amongst gear types," and that the only rationale for the gear differential disappeared once the inshore/offshore fleet line was not included in the MFMP. Plaintiffs' Motion, PP. 11–12. Plaintiffs also state that while § 600.325(c)(3)(i)(B) does permit the imposition of a hardship on one group if this hardship is outweighed by another group's benefits, that nevertheless the proper procedure requires that the Council conduct a cost/benefit analysis and consider alternatives to the disputed regulations. *Id.* Plaintiffs contend that this cost/benefit analysis was never done.

Defendants concede that, "[i]n part," the basis for the gear differential was rooted in a distinction between inshore and offshore fishing, but do not address the fact that the inshore/offshore distinction was never made part of the MFMP. Defendants' Motion, PP. 20–21. Instead, defendants point to the justification printed in the Federal Register:

The purpose of the trip limits is to be fair and equitable to all fishers. They are designed to reflect each sector's historic level of participation in the fishery and approximate the customary bycatch of these vessels. Since the limits represent equivalent reductions for each gear sector to promote conservation, the limits have been determined to be consistent with national standard 4.

Record, 9491. "The fact that gillnetters may tend to fish inshore because they have smaller boats or for economic reasons, and trawlers offshore because they may be targeting other species as well, on longer trips and with higher operating costs," assert the defendants, "is sufficient justification for the differential." Defendants' Motion, P. 21.

This is a closer question than the analysis of National Standard Two. As noted in that section of this report, there is evidence that the gear differential regulations came about as the result of a compromise between the various sectors of the fishing industry and the Councils. If the regulations were based upon a desire to accommodate the needs of the trawling industry, admittedly a larger monkfish industry than the gillnet industry, based upon the historic economic needs of the trawling industry, then that rationale is permitted by § 600.325(c)(3)(i)(B) ("An allocation of fishing privileges may impose a hardship on one group if it is outweighed by the total benefits received by another group or groups."). As a purely fiscal consideration, therefore, this court can discern a fair and equitable reason for the gear differential, although there is very little in the way both of an analysis of costs and benefits of the gear differential and of an assessment of viable alternatives. Defendants cite to the statement that the "the limits represent equivalent reductions" reflecting each gear type's level of market participation, but there is no document in the Record that indicates the calculation of such "equivalent reductions." Indeed, the

court gleans from the information cited that trawling gear is responsible for roughly two to three times as much of the monkfish catch as is gillnet gear (*see* Record, 7320, 7321); yet the disputed regulations permit trawlers to catch five times as much monkfish per day at sea as can gillnetters. This does not represent an "equivalent reduction." Furthermore, defendants fail to articulate why a regulation whose primary rationale lay in the inshore/offshore fishing line, a line not implemented by the MFMP, continues to be fair and equitable now. Nevertheless, our standard of review is a narrow one, and the defendants have offered something of a rational explanation for why the regulation was fair and equitable given the historic level of participation of the trawling and gillnet monkfish fisheries.

### ii. *Do the regulations promote conservation?*

In order to determine whether a challenged regulation is reasonably calculated to promote conservation, in accordance with 16 U.S.C. § 1851(a)(4)(b), the following language provides assistance:

> (ii) Promotion of conservation. Numerous methods of allocating fishing privileges are considered "conservation and management" measures under section 303 of the Magnuson Stevens Act. An allocation scheme may promote conservation by encouraging a rational, more easily managed use of the resource. Or, it may promote conservation (in the sense of wise use) by optimizing the yield in terms of size, value, market mix, price, or economic or social benefit of the product. To the extent that rebuilding plans or other conservation and management measures that reduce the overall harvest in a fishery are necessary, any harvest restrictions or recovery benefits must be allocated fairly and equitably among the commercial, recre-

ational, and charter fishing sectors of the fishery.

50 C.F.R. § 600.325(c)(3)(ii). Plaintiffs assert again that the Record supports the argument that the disputed regulations were merely the result of a compromise to garner the support of the trawling industry. Plaintiffs' Motion, P. 12. Furthermore, plaintiffs claim that "[d]efendant's designees never analyzed the gear allocation's potential conservation effect.... As it presently stands, the scallopers and trawlers bring in larger quantities of smaller fish than do the gillnetters." *Id.* at 12–13. Defendants respond that

> ... the MFMP expressly recognized that the different trip limits 'are expected to contribute to mortality reductions and achieve the biological objectives in year 2.' The basis for that statement is the various places in the administrative record where the Councils considered, discussed, or modified proposed gear limitations because of differences in the way fixed gear fishers prosecute the fishery as opposed to those who use mobile gear.

Defendants' Motion, P. 22 (citing Record, 7274).

I find defendants' argument adequate. Here, the Secretary has promulgated a plan that implements per day trip limits for various gear types, increasing in severity over a series of years, where previously there were no limits. The statement at Record, 7274 that the regulations "[are] expected to contribute to mortality reductions and achieve the biological objectives" of the MFMP and the Magnuson Stevens Act is sufficient to fulfill National Standard Four's mandate that the regulations be reasonably calculated to promote conservation. The Secretary has imposed limits on both gillnetters and trawlers; because any limitation will assist in stock repletion, the

Secretary has not acted arbitrarily with respect to this portion of National Standard Four.

### iii. *Do the regulations award excessive shares of fishing privileges?*

Once again, the language of the Magnuson Stevens Act is amplified by the following statement:

> (iii) Avoidance of excessive shares. An allocation scheme must be designed to deter any person or other entity from acquiring an excessive share of fishing privileges, and to avoid creating conditions fostering inordinate control, by buyers or sellers, that would not otherwise exist.

50 C.F.R. § 600.325(c)(3)(iii). If the regulation is "tailored to solve a gear conflict problem and to promote the conservation" of the monkfish, the Secretary of Commerce is allowed "to sacrifice the interests of some groups of fishermen, for the benefit as the Secretary sees it of the fishery as a whole." *Alaska Factory Trawler*, 831 F.2d at 1460; *Alliance Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir.1996).

Both parties cite to *Alaska Factory Trawler* in support of their respective positions. In that case, an association of pot-fishing and trawling fishermen sought to invalidate an amendment to the Gulf of Alaska Groundfish Fishing Management plan. *Alaska Factory Trawler*, 831 F.2d at 1459. The disputed amendment, issued by the Secretary of Commerce, concerned the allocation of the sablefish optimum yield in the Gulf of Alaska among fishermen using various methods of fishing for groundfish: longline gear, pot gear, and trawl gear. *Id.* at 1461. As in the case of the monkfish, the court determined that the sablefish was extensively fished and overfished by fishermen using trawling gear. *Id.* The longline fishermen presented various arguments to the North Pacific

Fishery Management Council ("NPFMC") that counseled for a restraint on pot gear and trawl gear sablefish fishing. After extensive study and public meetings on the effects of a gear restraint on the sablefish stock (*see id.* at 1461–62, ¶¶ 7–8), the NPFMC, having considering a range of alternatives (*see id.* at ¶¶ 11–12), recommended that the Secretary pass the amendment. The plaintiffs then filed an action asking that this amendment be declared unlawful to the extent that it prohibited or restricted the harvest of sablefish by pot fishermen or trawlers in the Gulf of Alaska. *Id.* at 1463. In affirming the district court's grant of summary judgment to the defendant, the Ninth Circuit stated, with respect to the plaintiffs' National Standard Four claim:

> Plaintiffs claim that [the amendment] violates [National Standard 4] because it discriminates in favor of longline fishermen, who are predominantly Alaskan, at the expense of trawlers and pot fishermen, who are predominantly non-Alaskan.... The administrative record constantly refers to the ground preemption and gear conflict problems which result from pot fishing and trawl fishing in the same area as longline fishing. In addition, the record indicates that all longliners will benefit from the regulation, not just Alaskan longliners. In light of this information, the Secretary could reasonably conclude that even though there may be some discriminatory impact from [the amendment], the regulations satisfy the requirements of National Standard 4 in that they are tailored to solve the gear conflict problem and to promote the conservation of the sablefish.

*Id.* Plaintiffs allege that the Record support in the case at bar is lacking in the kind of information and analysis present in the *Alaska Factory Trawler* record.

Plaintiffs' Motion, P. 13 ("The Administrative Record [in *Alaska Factory Trawler*] detailed a conflict, determined who would benefit from the gear prohibition, and analyzed and demonstrated how the regulations would promote conservation. Here, Defendant's designees have assembled no information of this quality in the Administrative Record ....") (citations omitted). Defendants liken "the many discussions in the record about gear conflicts, the different ways trawl and gillnet fishers fish, and the rationale behind the different limits" to the sort of analysis that contributed to the amendment in *Alaska Factory Trawler*. Defendants' Motion, P. 24.

Defendants prevail here because the regulations at issue do not allocate to any person or other entity an excessive share of fishing privileges, nor do they create conditions fostering inordinate control by buyers or sellers of the monkfish industry. The Secretary is permitted to sacrifice the interests of a group of fishermen under this portion of National Standard Four, if in so doing he ameliorates the depleted state of the monkfish. Again, there is no question that day at sea monkfish trip limits of any kind, where previously there existed none, will assist in the repletion of the monkfish stock. Nothing in the regulations in question speaks in terms of allocating certain fishing privileges to a particular person or entity or in terms of vesting control of the monkfish market in a certain set of sellers or buyers. Therefore, the regulations do not violate National Standard 4.[17]

e. *National Standard Five*

Plaintiffs claim that 50 C.F.R. § 648.94(b)(2)(iii) and (v) do not comply with National Standard Five of the Magnuson Stevens Act, which states: "Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose." 16 U.S.C. § 1851(a)(5). 50 C.F.R. § 600.330(e) elaborates on the meaning of an "economic allocation:"

> (e) Economic allocation. This standard prohibits only those measures that distribute fishery resources among fishermen on the basis of economic factors alone, and that have economic allocation as their only purpose. Where conservation and management measures are recommended that would change the economic structure of the industry or the economic conditions under which the industry operates, the need for such measures must be justified in light of the biological, ecological, and social objectives of the FMP, as well as the economic objectives.

The parties disagree about whether or not economic allocation was the sole justification for the gear differential regulations. Plaintiffs reiterate their claim that the only rationale for the regulation rested on an economic compromise, and defendants cite once more to the conclusory statement at Record, 7274, that "[t]he trip limits are expected to contribute to mortality reduction and achieve the biological objectives in year 2." Defendants' Motion, P. 26. Defendants also raise the questionable claim that because "one can review all of the minutes and transcripts of the meetings of both Councils and not find a direct or indirect reference to the trip limit differ-

---

17. At oral argument, plaintiffs' counsel alleged that the MFMP created an entirely new monkfish fishing regime for scallop dredgers, who may seek out monkfish once the scallop resource becomes scarce. While this may be true, it is doubtful that this allocation violates National Standard Four. More importantly, however, it is peripheral to the focal concern here and will not be further addressed.

ences as based only on economic allocation," that something other than economic allocation undergirded the regulations. *Id.* I reject this argument both because its logic is faulty and because very little in the Record supports the argument that anything other than economics prompted the gear differential. As already noted, defendants have not directed this court to a single piece of biological or ecological evidence supporting the gear differential. There was some discussion at oral argument by defense counsel that the day at sea trip limits for different gear types represent an equitable, pro rata reduction based on the level of participation of each gear type in the monkfish market. If this is the case, that would constitute a rationale for the regulations based in something other than economics alone: namely, fairness. But there is no evidence in the Record documenting the calculation of such an equitable, proportional reduction—we have only the bald-faced, unsupported assertions of defense counsel to stack against the standard posed by National Standard Five. As it stands now, therefore, the regulations do not comply with National Standard Five.

### f. *Substantive Review of the Councils' Recommendation, pursuant to the APA*

16 U.S.C. § 1854(a)(1)(A) provides the following:

(a) Review of plans

(1) Upon transmittal by the Council to the Secretary of a fishery management plan or plan amendment, the Secretary shall—

> (A) immediately commence a review of the plan or amendment to determine whether it is consistent with the national standards, the other provisions of this chapter, and any other applicable law. . . .

It is the Secretary of Commerce, and not the Councils, who is authorized to promulgate a regulation. *See J.H. Miles,* 910 F.Supp. at 1159 ("[The Council] cannot promulgate fishing quotas. It cannot issue rules affecting the fishery. Its power is limited to 'recommending' the quotas to the Secretary. . . . [A]t the end of the day, the Secretary does have the power to alter the recommendations of the Mid Atlantic Council, and he alone has the power to promulgate the quotas."). The broad grant of discretionary authority to the Secretary of Commerce in this chapter is tempered by the requirement that the Secretary comply with congressionally declared standards and objectives, and that his reasoning appear with sufficient clarity in the record for a court to review such compliance. *See Maine v. Kreps,* 563 F.2d at 1055.

■ Plaintiffs state that the defendants failed in their statutory duty to conduct a substantive review of the Councils' recommendation in favor of the gear differential allocation. Plaintiffs' Motion, P. 16. Instead, plaintiffs allege that the defendants "rubber stamp[ed]" the challenged regulations, thereby "short-circuit[ing] the entire administrative process delineated in the Magnuson Stevens Act." *Id.* (citing 16 U.S.C. § 1854(a)-(h)). Defendants state that the Secretary's decision to adopt the Councils' recommendation and promulgate the regulations was based in part on Eric Smith's comment at the New England Council's meeting on February 25, 1998, that the 300 lb. limit for gillnets was "restrictive, but liveable" and "get[s] us to an intermediate point that helps us achieve the objective." Defendants' Motion, P. 27 (citing Record, 5299). Defendants also argue that there is little factual support for what they term plaintiffs' "bare allegation that the Secretary conducted an insufficient review." *Id.*

Indeed, with respect to National Standards Two and Five of the Magnuson–Stevens Act, there is little that is factual in the Record that has anything to do with the gear allocation differential. There is no substantive review present in the Record that demonstrates that the Secretary found 50 C.F.R. § 648.94(b)(2)(iii) and (v) to be compliant with National Standards Two and Five of the Magnuson Stevens Act; in fact, there is no analysis or review of the Councils' recommendations vis a vis the disputed regulations at all in the Record. This glaring lacuna makes it most difficult for a reviewing court to comprehend, given the state of the Record, the basis for the Secretary's promulgation of these regulations. Because the Record is devoid of any indication that the Secretary did review the regulations for compliance with National Standards Two and Five of the Magnuson Stevens Act, this court concludes that the Secretary did not discharge his statutory duty to undertake "a review of the plan or amendment to determine whether it is consistent with the National Standards, the other provisions of this chapter, and any other applicable law." [18]

### g. *The RFA*

■ The Regulatory Flexibility Act of 1980 ("RFA") aims to prevent the inequitable impact of agency rules on small businesses, small organizations, and other small entities.[19] 5 U.S.C. §§ 601–612 (1994 & Supp. III 1997). The RFA accomplishes its goal by requiring agencies to analyze their rules and attempt to reduce the rules' impact on small businesses prior to their promulgation. *See* Jennifer McCoid, Comment, *EPA Rulemaking Under the Regulatory Flexibility Act: The Need for Reform*, 23 B.C. Envtl. Aff. L.Rev. 203, 208 (1995). The RFA requires agencies to prepare an Initial Regulatory Flexibility Analysis ("IRFA") of a proposed rule and publish it in the federal register. *See id.;* 5 U.S.C. § 605(b). After a comment period, a Final Regulatory Flexibility Analysis ("FRFA") accompanies the publication of a final rule, and agencies are exempt from this process only if they certify that the proposed rule does not significantly impact a "substantial number" of small entities. *See* 5 U.S.C. §§ 604, 605(b). Although the APA already permits public comment on proposed agency rules, the RFA places new responsibilities on agencies to develop accurate and thorough RFA analyses. If an agency determines that a significant impact on small entities exists, it must explore alternatives to the regulatory proposals that would mitigate the potential economic and regulatory effect. 5 U.S.C. § 603(c). "The RFA does not command an agency to take specific substantive measures, but rather, only to give explicit consideration to less onerous options." *A.M.L. International*, 107 F.Supp.2d at 105; *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir.1997). An FRFA must contain:

a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of the applicable statutes, including a statement of the factual, policy and legal reasons for se-

---

**18.** The mere fact that Eric Smith described the regulations as "restrictive, but liveable" and that they would "get us to an intermediate point that helps us achieve the objective" does not convince this writer that the Secretary conducted the sort of substantial review, pursuant to 16 U.S.C. § 1854(a)(1)(A), envisioned by Congress.

**19.** A "small entity" as defined by the RFA encompasses a variety of small organizations, including small businesses, nonprofit enterprises, and small governmental jurisdictions. *See* 5 U.S.C. § 601(6).

lecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected. 5 U.S.C. § 604(a)(5). Hence, "... Congress, in enacting section 604, intended to compel administrative agencies to explain the bases for their actions and to ensure that alternative proposals receive serious consideration at the agency level." *Associated Fisheries of Maine*, 127 F.3d at 114.

In its original enactment, the RFA precluded judicial review of an agency's failure to comply with its requirements, but in 1996 Congress amended the RFA by passing the Small Business Regulatory Enforcement Fairness Act ("SBREFA") which provides for judicial review of the mandatory regulatory flexibility analysis. Small Business Regulatory Enforcement Fairness Act of 1996, Pub.L. No. 104–121, §§ 241–42, 603(a), 611, 110 Stat. 857, 864–66 (codified as amended at 5 U.S.C. §§ 603(a), 611 (Supp. III 1997)).

■■■ The parties are in agreement that plaintiffs constitute "small entities" within the meaning of the RFA, that the Secretary of Commerce and NMFS prepared and offered an IRFA for public notice and comment, and that an FRFA followed. Plaintiffs' Motion, P. 17; Defendants' Motion, P. 28. Instead, plaintiffs assert that the IRFA and FRFA are inadequate and

> fatally flawed—an (sic) unsupported— because, at bottom, [they do] not recognize the costs of (1) forcing closures of the directed monkfishing industry within 4 years, supposedly in order for that industry to receive positive revenue benefits after 20 years, (2) forcing particularly harsh consequences on small businesses, and (3) failing to conduct an assessment of meaningful, and more gradual, restrictions in order to avoid the above-referenced severe costs to

small businesses using commensurate scientific analysis.

Plaintiffs' Motion, P. 20. In essence, plaintiffs are alleging that neither the IRFA nor the FRFA

> provide an assessment of the real economic impact on these small entities.... In the IRFA, NMFS ... states that there were a total of 1,401 vessels that recorded monkfish in 1997. But, the rule and the FMP did not quantify how many of these 1,401 vessels actually depend on this species in a meaningful way.... Moreover, the IRFA and FRFA both failed to address the disparity in landing allocations between the different gear types.

*Id.* at P. 18 (citations omitted).

Defendants refute the allegation that the IRFA fails to assess the number and quality of vessels affected by the regulations:

> The IRFA breaks down potential revenue losses in terms of numbers of vessels, category and size of vessel, by geographic area of landings, and by home state. Furthermore, it specifically addressed the category of "vessels impacted by 35% or more" which the IRFA does not expressly assign to Plaintiffs' class, although Plaintiffs themselves say they fall into that category. The IRFA contains a detailed discussion of "at risk" vessels, into which category Plaintiffs' vessels fall. Additionally, both the proposed rule and the final rule include the specific recognition that gillnetters will be disproportionately impacted. The administrative record contains other examples of the Defendant having taken into account the fact that gillnetters were especially impacted by the differential. Therefore, Plaintiffs are simply incorrect in arguing that the Councils did not consider the impact on gillnetters in particular.

Defendants' Motion, P. 29 (citations omitted). With respect to the FRFA, defendants state that "[t]he final rule includes a statement of the factual, policy, and legal reasons for selecting the alternatives adopted in the final rule" and point to a tract from the Federal Register in support of this claim:

> The measures are restrictive, and impacts on the industry are expected to be considerable. In the early years of the program, some vessel owners may be unable to cover their operating costs, in part because of these restrictions and because of the poor condition of the stocks. Such vessel owners are expected to leave the fishery. Relative to the status quo, however, implementation of this FMP is expected to produce significant positive effects on a substantial number of small entities after stock abundance of monkfish recovers. The majority of the vessels in the monkfish fishery are considered small entities and, therefore, all alternatives and measures intended to mitigate adverse impacts on the fishing industry necessarily mitigate adverse impacts on small entities. Chief among the measures taken that minimizes the impacts on small entities, however, is the selection by the Council of the longest rebuilding period allowed by the Magnuson Stevens Act.

*Id.* (citing Record, 9493). Finally, defendants conclude by asserting that "the RFA does *not* require NMFS to choose an alternative that substantially lessens the economic impact on small entities. . . . Where, as here, express legislative mandates require NMFS to implement conservation measures, some detrimental economic impacts on fishers are unavoidable." *Id.* at P. 31 (emphasis in original).

After reviewing defendants' cited support in the Record, I conclude that there is indeed enough evidence in the IRFA to show that defendants considered the economic effect of the MFMP as a whole upon small entities. Record 7634—7645 comprises the bulk of the IRFA analysis of economic impact on small entities, and these pages are replete with charts and projections of the effect that the MFMP will have on a wide assortment of small entities. This data includes: a chart tabulating the number of fishing vessels by gross revenue loss interval (Record, 7635); a chart tabulating the number of vessels and their losses according to monkfish qualifications and permit status (*id.*); a summary of affected vessels and their losses by ton class (Record, 7636); a summary of vessels affected by the proposed action by state of principal landings port (*id.*); a summary of vessels affected by the proposed action by the home state (Record, 7637); an analysis of those vessels impacted by 35% or more (*id.*); a summary of anticipated limited access qualification permit holdings by vessels that are estimated to have a 35% or more impact on total gross revenues (Record, 7638); a table of at-risk vessels by tonnage class, and by principal landings port (*id.*); primary gear types used by at-risk vessels (demonstrating more than twice the economic impact on gillnetters as on other fishers), at-risk vessels by primary monkfish gear and monkfish qualification, and at-risk vessels by primary monkfish gear and tonnage class (Record, 7640); at-risk vessels by primary monkfish gear and principal port state and principal port (Record, 7641); mitigating factors (Record, 7642); indirectly affected industries (*id.*). All of these documents plainly rebut the allegation that the IRFA does not consider the economic impact of the MFMP, including 50 C.F.R. § 648.94(b)(2)(iii) and (v), on gillnetters.

 There is also evidence in the IRFA that "less onerous" alternatives to the 300/1,500 lb. gear differential were

considered. Defendants indicate that Record, 7408 "et seq." prove that alternatives to the day at sea gear trip differential were considered and rejected by the Councils. Defense counsel pointed out at oral argument that nothing in the RFA requires the government to distinguish between classes of small businesses, and that since both gillnet fishers and trawl fishers generally operate small businesses, no separate RFA analysis contrasting the two was required. Plaintiffs' counsel argued that such an application of the RFA would render it meaningless for the gillnet fishers of monkfish off the Atlantic coast. Specific, substantive measures, however, are not required by the RFA. This court only reviews whether the agency considered other alternatives less onerous to small businesses as a whole; the court cannot require that the agency give explicit consideration to certain classes of small businesses that are affected more gravely than other small businesses. The regulations, therefore, comply with the RFA.

### h. *Remedy*

 'Full fathom five' the court now lies, faced with fashioning a fair remedy, far beyond the depths of its common expertise. Having determined that 50 C.F.R. § 648.94(b)(2)(iii) and (v) violate National Standards Two and Five of the Magnuson Stevens Act, what should the court now do to rectify the problem? At oral argument, counsel for plaintiffs stated that he would have the court strike down the regulations and erect new standards of its own design. Defendants urge in their papers that if any remedy is to be had, the "correct remedy here" would constitute a remand for clarification of the Record to the Secretary of Commerce. With respect to National Standard Two, the court recommends the remedy outlined in *Massachusetts v. Daley:* "Where a regulation is not adequately supported, the normal

practice is to set is aside pending further proceedings." I am thoroughly convinced that nothing contained in the administrative record or propounded by defense counsel at oral argument demonstrates that these regulations are founded upon the best scientific information available. Therefore, I recommend that the court set these regulations aside for failure to comply with National Standard Two of the Magnuson Stevens Act pending further proceedings. With respect to National Standard Five, defense counsel did allude at oral argument to a rationale for the regulations based on an equitable, pro rata · reduction for each gear type-something other than a solely economic basis for the allocation. Though the Record does not clearly bear out this rationale, the defendants should be permitted to explain further their position on this question, clarifying for the court the data that the agency considered in achieving this equitable reduction. If the court elects not to set aside the regulations for failure to comply with National Standard Two, I recommend that it remand the regulations back to the defendants, requiring them to explain further how 50 C.F.R. § 648.94(b)(2)(iii) and (v) comport with National Standard Five of the Magnuson Stevens Act. *See Maine v. Kreps,* 563 F.2d at 1056; *Celcom Communications Corp. v. FCC,* 789 F.2d 67, 71 (D.C.Cir.1986).

### *Conclusion*

For the aforementioned reasons, I recommend that this court grant plaintiffs' motion for summary judgment as to Counts One, Three and Four of the Hall Complaint; Counts One, Three and Four of the Lund's Fisheries Complaint; and Counts One, Three and Four of the McCann Complaint. I conversely recommend that the court deny plaintiffs' motion for summary judgment as to all other

Counts in all four Complaints. I also recommend that defendants' motion for summary judgment be granted as to all Counts of the Reaper complaint; Counts Two, Five and Six of the Hall Complaint; Counts Two, Five and Six of the Lund's Fisheries Complaint; and Counts Two, Five and Six of the McCann Complaint. Finally, I recommend that the regulations 50 C.F.R. § 648.94(b)(2)(iii) and 50 C.F.R. § 648.94(b)(2)(v) be set aside pending further proceedings based on the regulations' failure to comport with National Standard Two of the Magnuson Stevens Act. Alternatively, I recommend that the court remand the regulations to the Secretary of Commerce and require that the Secretary or his designees provide evidence that the regulations comport with National Standard Five of the Magnuson Stevens Act. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. *See* Rule 32, Local Rules of Court; Fed.R.Civ.P. 72(b). Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the District Court and the right to appeal the District Court's decision. *See United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980).